IN THE UNITED STATES DISCTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| FLORENCE MICHELLE HAWKINS,<br>    Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv31 (JRS) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
|    Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Florence Michelle Hawkins ("Plaintiff") is forty-eight years old and previously worked

as a medical assistant. On December, 15, 2011, Plaintiff applied for Social Security Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act ("Act"). Both claims stemmed from degenerative disc disease, obstructive sleep apnea,

anxiety disorder, affective disorder and obesity, with an alleged onset date of September 23,

2011. Plaintiff's application was denied both initially and upon reconsideration. On September

10, 2013, Plaintiff testified before an Administrative Law Judge ("ALJ"). On October 2, 2013,

the ALJ issued a written decision denying Plaintiff's claims for DIB and SSI. On December 4,

2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the

final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by affording very limited weight to the opinion of Plaintiff's treating

physician. Defendant responds that the ALJ did not err and that substantial evidence supports

the ALJ's decision. The parties have submitted cross-motions for summary judgment that are now ripe for review.

Having reviewed the parties' submissions for summary judgment and the entire record[1] in this case, the Court is now prepared to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Plaintiff's Motion to Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 17) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff challenges whether the ALJ erred in affording very limited weight to Plaintiff's treating physician's opinion regarding her physical impairments, Plaintiff's education and work history, pertinent medical history, function report, Plaintiff's hearing testimony and vocational expert ("VE") testimony are summarized below.

A. Education and Work History

Plaintiff was forty-six years old when she applied for DIB and SSI. (R. at 26.)  Plaintiff did not graduate from high school, but earned a GED and an associate's degree. (R. at 41, 259.) Plaintiff previously worked as a medical assistant, home health aide and security guard. (R. at 259.)

---

[1]    The administrative record in this case has been filed under seal pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B. Medical Records

1. Bon Secours

On March 30, 2011, Plaintiff saw Sharon E. Joseph, M.D. at Bon Secours Powhatan

Medical Group. (R. at 539-40.) Dr. Joseph noted that Plaintiff was a new patient at this office,

but that she had seen Plaintiff previously at Dr. Joseph's former office. (R. at 540.) Plaintiff had

no major medical concerns, and the primary purpose for her visit was to establish care and make

sure that she was healthy before she lost her insurance coverage. (R. at 540.) A physical

examination revealed trace edema in Plaintiff's legs, but yielded otherwise normal results. (R. at

540.) Dr. Joseph diagnosed Plaintiff with edema in both legs, vitamin D deficiency and

acanthosis nigricans (a skin condition). (R. at 540.) She prescribed a refill of Plaintiff's Lasix

prescription that she took for her edema. (R. at 540.)

On June 20, 2011, Plaintiff saw Naim S. Bashir, M.D. at the Bon Secours Sleep

Disorders Center for a sleep medicine consultation. (R. at 339-40.) Plaintiff informed Dr.

Bashir that she had been diagnosed with obstructive sleep apnea four years earlier and had been

treated with continuous positive airway pressure ("CPAP") therapy. (R. at 339.) Approximately

one year before this appointment, she began bilateral positive airway pressure therapy. (R. at

339.) Plaintiff told Dr. Bashir that she was unable to sleep comfortably while on her positive

airway pressure therapy and that her sleep quality remained poor, despite her experimentation

with different types of masks. (R. at 339.)

Dr. Bashir conducted a physical examination of Plaintiff and opined that she appeared

well-developed, obese and well-groomed. (R. at 339.) Plaintiff's neck, chest, heart and

abdomen appeared normal. (R. at 340.) Dr. Bashir observed no digital clubbing, cyanosis or

edema in Plaintiff's extremities. (R. at 340.) Plaintiff appeared awake, alert, ambulating and

3

oriented, and Dr. Bashir opined that she was "[a] pleasant individual with good mood and affect." (R. at 340.) Dr. Bashir assessed Plaintiff as having obstructive sleep apnea and difficulties with positive airway pressure therapy. (R. at 340.) He reviewed the fit of Plaintiff's CPAP mask and provided her a different kind of mask to try. (R. at 340.) Dr. Bashir adjusted the bilateral pressures of Plaintiff's CPAP mask and instructed her to follow up in two weeks. (R. at 340.)

On July 12, 2011, an overnight polysomnography showed that Plaintiff had normal electroencephanlography ("EEG") data, normal sleep latency (including normal light sleep and deep sleep), an increased percentage of rapid eye movement ("REM") sleep with decreased REM latency, two apneas and no significant oxygen desaturations at final pressure. (R. at 355, 358.) A multiple sleep latency test performed the following day showed no evidence of significant hypersomnia. (R. at 354.) During a follow-up appointment on July 25, 2011, Dr. Bashir described Plaintiff's sleep quality from the overnight polysomnography as excellent. (R. at 347.) He adjusted the pressure on Plaintiff's CPAP device and instructed her to use it nightly, referred her to a cardiologist for evaluation of her leg pain, noting that it was possibly due to peripheral vascular disease, and recommended that Plaintiff schedule follow-up appointments at the CPAP clinic and with him in thirty days and six months, respectively. (R. at 348.) On February 3, 2012, a repeat polysomnography indicated "no evidence of significant obstructive sleep apnea." (R. at 573-74.)

On July 30, 2011, Plaintiff saw Hedley Mendez, M.D., complaining of back pain stemming from a treadmill heart test two days earlier. (R. at 373.) Dr. Mendez noted that Plaintiff was married and sexually active, and that her risk factors included obesity and lack of exercise. (R. at 373-74.) On examination, Dr. Mendez observed that Plaintiff exhibited normal

4

range of motion with right lumbar tenderness. (R. at 375.) Dr. Mendez diagnosed Plaintiff with sciatica. (R. at 373.) Dr. Mendez prescribed Valium, Percocet and Prednisone, and instructed Plaintiff to continue taking vitamin D3 and Lasix. (R. at 377.)

On August 3, 2011, Plaintiff returned to the emergency department at Bon Secours, complaining of right leg pain. (R. at 379.) X-rays revealed a normal right hip with no signs of abnormalities, normal lumbar spine alignment and well-preserved vertebral body heights. (R. at 380-81.) The imaging report noted mild spondylitic changes at L2-3 and L3-4 with no fracture, subluxation or other abnormality. (R. at 381.)

On September 4, 2011, Plaintiff again sought treatment at Bon Secours, complaining of chronic lower back pain on her right side. (R. at 384.) Plaintiff stated that she had been experiencing moderate intensity "shooting" pain for more than a week. (R. at 384.) Plaintiff indicated that her pain was associated with lifting and twisting, and that bending, twisting and certain positions aggravated her symptoms. (R. at 384.) Plaintiff reported paresthesias and tingling, but no chest pain, fever, numbness, abdominal pain or swelling, bowel or bladder incontinence, perianal numbness, paresis or weakness. (R. at 384.) She stated that Prednisone helped. (R. at 384.) Umaran H. Choudry, M.D. conducted an examination that revealed, in pertinent part, tenderness, normal range of motion and no signs of edema. (R. at 386.) Dr. Choudry increased Plaintiff's dose of Prednisone, prescribed Vicodin and Motrin, and continued her other medications. (R. at 389.)

On September 19, 2011, Plaintiff followed-up with Dr. Joseph regarding her emergency room visit. (R. at 526.) Plaintiff complained of worsening lower back pain that extended down her right leg. (R. at 526.) Upon examination, Plaintiff exhibited decreased range of motion in her lower back and numbness and pain extending down her right leg. (R. at 526.) She was alert

and oriented to person, place and time, but displayed abnormal reflexes in both knees. (R. at 526-27.) Dr. Joseph recommended that Plaintiff undergo an MRI of her lumbar spine, because her recent x-rays revealed only spondylitic changes and her pain was worsening. (R. at 526-27.) Dr. Joseph refilled Plaintiff's prescription for Ultram and started her on Neurontin, and instructed her to return if her symptoms worsened or failed to improve. (R. at 527.)  Subsequent MRI imaging of Plaintiff's lumbar spine revealed normal alignment, mild degenerative changes at L3-4 and L4-5, and a possible small synovial cyst abutting the slightly thickened left S1 nerve root. (R. at 403-04.)

On October 4, 2011, Plaintiff saw Brian J. Foster, M.D. for an initial visit regarding her back pain. (R. at 495.)  Plaintiff informed Dr. Foster that she had visited the emergency room twice over the past summer for her back pain, and that her pain improved with steroid tapers and pain medication, including Neurontin and Tramadol. (R. at 495.)  Plaintiff described her pain as radiating down her legs, with the right leg being more painful than the left leg. (R. at 495.) Plaintiff stated that lying down, leaning forward and taking a hot bath helped her pain, but sitting or standing too long worsened it. (R. at 495.)  Dr. Foster performed a physical examination of Plaintiff that yielded normal results, including normal range of motion and a muscle strength rating of 5/5 in all muscle groups. (R. at 495.)  He assessed Plaintiff as having sciatica, chronic lower back pain and vitamin D deficiency, and referred her for physical medicine rehabilitation and evaluation by an orthopedic surgeon. (R. at 495.)  Dr. Foster instructed Plaintiff to return in one month for a follow-up appointment for her back pain. (R. at 495.)

On November 1, 2011, Plaintiff saw Dr. Foster for a follow-up appointment regarding her back pain. (R. at 493.)  The results of Dr. Foster's physical examination remained essentially unchanged from Plaintiff's appointment on October 4, 2011. (R. at 493.)  Dr. Foster noted that

Plaintiff's sciatica continued to bother her and that she was waiting on an orthopedic appointment at VCU Health System.  (R. at 493.)  Plaintiff had not followed through on Dr. Foster's physical medicine and rehabilitation referral due to her insurance, but Dr. Foster asked her to inquire about a payment plan.  (R. at 493.)  Dr. Foster instructed Plaintiff to take a vitamin D supplement and ordered lab work to recheck her hyperlipidemia.  (R. at 493.)  He diagnosed Plaintiff with anxiety and prescribed Citalopram.  (R. at 493.)

On November 26, 2011, Plaintiff saw Alexis A. Dimaio, M.D., complaining of right back pain that shot down her buttock and right leg.  (R. at 407.)  Dr. Dimaio performed a physical examination that revealed a normal musculoskeletal range of motion with no edema and no tenderness.  (R. at 409.)  Plaintiff's straight leg raising test was negative bilaterally.  (R. at 409.)  Plaintiff was alert and oriented with normal mood and affect.  (R. at 409.)  Dr. Dimaio diagnosed Plaintiff with a urinary tract infection and sciatica.  (R. at 407, 410.)  Dr. Dimaio prescribed an antibiotic and recommended pain medications and follow-up with physical therapy.  (R. at 410.)

### 2. Sheltering Arms Rehabilitation Center

Dr. Foster referred Plaintiff to the spine center at Sheltering Arms Rehabilitation Center, where Scott N. Schimpff, M.D. evaluated Plaintiff for complaints of pain in her lower back and both legs on December 12, 2011.  (R. at 471.)  Dr. Schimpff noted that Plaintiff's MRI showed multi-level degenerative disc and facet disease.  (R. at 471-72.)  He performed a physical examination of Plaintiff and reported 1+ pitting edema in both legs and swelling on palpation, bilateral patellar deep tendon reflexes of 1+/4, normal sensation to light touch, tenderness on palpation in Plaintiff's lower back, muscle strength of 5/5 in all major muscle groups, positive bilateral straight leg raise and an increase in lower back pain with forward flexion.  (R. at 472.)  Dr. Schimpff assessed Plaintiff as having lumbar radiculopathy, lumbar degenerative disc

disease, lumbar spondylosis, obesity and a sleep disorder. (R. at 472.) He ordered physical therapy and prescribed a transcutaneous electrical nerve stimulation ("TENS") unit for home use, as well as Amitriptyline. (R. at 472.) In addition, Dr. Schimpff recommended an epidural steroid injection in her back, which Plaintiff declined. (R. at 472.)

On February 13, 2012, Plaintiff returned to Dr. Schimpff, complaining of pain in her lower back, both legs and both arms. (R. at 464.) She stated that the TENS unit was very effective, the Amitriptyline prescription was effective and that she had made some progress with physical therapy and a home exercise program. (R. at 464.) Plaintiff reported that her symptoms had improved approximately fifteen percent since her last office visit. (R. at 464.) On examination, Dr. Schimpff observed paraspinal tenderness to palpation over the spinous processes between Plaintiff's L4 and S1 vertebra. (R. at 465.) Plaintiff requested that Dr. Schimpff complete disability paperwork for her at her appointment. (R. at 464-65.) He informed Plaintiff that he could not fill out the forms until she completed a physical performance evaluation. (R. at 465.)

On April 25, 2012, Plaintiff visited Deborah Hill-Barlow, Ph.D., a clinical psychologist, for a psychological evaluation and to obtain treatment recommendations for her chronic pain-related depression and anxiety. (R. at 661.) In her evaluation, Dr. Hill-Barlow reported that Plaintiff favored her right side as she sat, had goal-directed thoughts and exhibited no signs of a formal thought disorder or psychosis. (R. at 663.) Dr. Hill-Barlow recommended therapy sessions to help with Plaintiff's depression and anxiety. (R. at 663.) Plaintiff attended her first counseling session the following week on May 2, 2012. (R. at 660.)

After a six-month gap, Plaintiff returned to counseling on November 15, 2012. (R. at 658.) At each of her three counseling appointments with Dr. Hill-Barlow in November and

8

December 2012, Plaintiff complained of depression. (R. at 656-58.) On May 7, 2013, Plaintiff reported to Dr. Hill-Barlow that she had been attempting to move more and walk in the mall. (R. at 655.) Plaintiff expressed frustration that she could not think of a job that she could physically perform in light of her inability to remain in one position for more than thirty to forty-five minutes at a time. (R. at 655.) On May 28, 2013, Dr. Hill-Barlow reported that Plaintiff had undergone blood work that ruled out several possible chronic conditions. (R. at 654.) Dr. Hill-Barlow also noted that Plaintiff was seeing a new primary care doctor through Bon Secours who was located closer to Plaintiff's home. (R. at 654.)

On June 14, 2012, Plaintiff had an MRI of her cervical spine at VCU Health System to rule out hypertension and stenosis. (R. at 613.) The MRI report stated that Plaintiff's cervical spine alignment was anatomical and the height of the vertebral bodies was maintained. (R. at 613.) No abnormal signals were detected in her spinal canal. (R. at 613.) Her C2-C3 disc was unremarkable. (R. at 613.) At C3-C4, there was mild right neural foraminal narrowing, but no spinal stenosis. (R. at 613.) At C4-C5 and C5-C6, there were mild disc bulges without spinal stenosis or neural foraminal narrowing. (R. at 613.) At C6-C7, there was a disc bulge without spinal stenosis and with moderate bilateral neural foraminal narrowing. (R. at 614.) At C7-T1, there was mild bilateral neural foraminal narrowing but no spinal stenosis. (R. at 614.) At T2, the image showed "hyperintense focus at the posterior aspect of the pituitary gland." (R. at 614.) The impression was mild degenerative changes with no spinal stenosis, and neural foraminal narrowing at C6-C7 and C7-T1. (R. at 614.)

### 3. Dr. Chen-Fernandez

Plaintiff began seeing Nelson J. Chen-Fernandez, M.D. in June 2012, seeking a second opinion regarding pain and numbness in her right arm and for evaluation of a growing brown

9

spot under her right eye. (R. at 646.) On June 27, 2012, Dr. Chen-Fernandez performed a

physical examination of Plaintiff and noted that she exhibited normal range of motion with no

clubbing, cyanosis or edema in her extremities, and that her back was unremarkable. (R. at 647.)

He prescribed Lyrica and Celebrex for Plaintiff's right arm pain, and referred her to a

dermatologist for the brown lesion under her eye. (R. at 647.)

On July 25, 2012, Plaintiff returned for a follow-up appointment with Dr. Chen-

Fernandez. (R. at 644.) She reported that her right elbow pain had improved with medication.

(R. at 644.) On examination, Dr. Chen-Fernandez noted that Plaintiff experienced pain in her

extremities on palpitation, and that her back remained unremarkable. (R. at 644.) Dr. Chen-

Fernandez prescribed Neurontin for Plaintiff's right elbow pain, stopped Lyrica and referred

Plaintiff for an orthopedic evaluation at VCU Health System for signs of bilateral carpal tunnel

syndrome. (R. at 645.)

On August 8, 2012, Plaintiff requested paperwork for a Department of Motor Vehicles

handicap sticker from Dr. Chen-Fernandez. (R. at 642.) Plaintiff complained of chronic lower

back pain that radiated to her right leg. (R. at 642.) On examination, Dr. Chen-Fernandez

observed that Plaintiff had a muscle spasm in the right lumbar area, pain with weight bearing and

paraspinal tenderness on palpation. (R. at 642.) Plaintiff's straight leg raising test was negative

bilaterally. (R. at 642.) Dr. Chen-Fernandez assessed sciatic neuralgia and abnormal gait. (R. at

642.) He refilled Plaintiff's Tramadol prescription and directed her to start using a cane. (R. at

643.)

On August 17, 2012, Dr. Chen-Fernandez noted that Plaintiff had sleep apnea and that

she needed to have her CPAP machine adjusted. (R. at 640.) On examination, Dr. Chen-

Fernandez noted that Plaintiff's back was unremarkable and that she had a normal range of

motion with no clubbing, cyanosis or edema in her extremities. (R. at 640.) Dr. Chen-Fernandez referred Plaintiff to a sleep specialist at VCU Health System for evaluation and management of her sleep apnea. (R. at 641.)

On September 7, 2012, Plaintiff requested that Dr. Chen-Fernandez increase her Tramadol dosage and prescribe her medication for concentration. (R. at 638.) Plaintiff complained that she continued to experience severe back pain. (R. at 638.) On examination, Dr. Chen-Fernandez noted paraspinal muscle tenderness in Plaintiff's lumbar spine and normal range of motion with no clubbing, cyanosis or edema in her extremities. (R. at 638-39.) Dr. Chen-Fernandez increased Plaintiff's Tramadol dosage and restarted her Lyrica prescription, and prescribed Strattera to improve her concentration. (R. at 639.)

On September 18, 2012, Plaintiff returned to Dr. Chen-Fernandez, complaining of elbow inflammation and pain, and requesting a steroid injection. (R. at 636.) A physical examination revealed pain on palpation and movement of the lateral aspect of Plaintiff's right elbow, positive bilateral Tinel and Phalen tests, and edema. (R. at 637.) Dr. Chen-Fernandez indicated that Plaintiff's back was unremarkable. (R. at 637.) Dr. Chen-Fernandez assessed right elbow enthesopathy not otherwise specified ("NOS"), hypertension and vitamin D deficiency NOS. (R. at 637.) Dr. Chen-Fernandez increased Plaintiff's Celebrex dosage, continued Neurontin and refilled Plaintiff's Lasix prescription for hypertension. (R. at 637.)

On October 26, 2012, Plaintiff requested that Dr. Chen-Fernandez complete paperwork for her disability application. (R. at 634.) Dr. Chen-Fernandez noted under "History of Present Illness" that Plaintiff had chronic back pain since 2011, with radiation to her right leg. (R. at 634.) On examination, Dr. Chen-Fernandez observed paraspinal muscle tenderness in Plaintiff's lumbar spine and normal range of motion with no clubbing, cyanosis or edema in her legs. (R. at

11

634-35.) Dr. Chen-Fernandez reported that Plaintiff could lift five pounds and lift eight pounds

with difficulty, but pushing and pulling a fifty-pound cabinet triggered Plaintiff's back pain. (R.

at 635.) Dr. Chen-Fernandez assessed sciatic neuralgia and increased Plaintiff's Neurontin

dosage. (R. at 635.)

That same day, Dr. Chen-Fernandez also completed a "Medical Assessment of Ability to

Do Work-Related Activities" form for Plaintiff's disability application. (R. at 563-65.) Dr.

Chen-Fernandez opined that Plaintiff's lower back pain and right leg pain and weakness affected

her ability to lift and carry. (R. at 563.) Dr. Chen-Fernandez indicated that Plaintiff could lift

and carry less than ten pounds occasionally, and that she could frequently lift and carry less than

five pounds. (R. at 563.) Further, her impairment affected her ability to stand and walk. (R. at

564.) Plaintiff could stand only for less than one hour at a time for a total of two hours each day,

and needed to use a cane. (R. at 564.) Plaintiff's lower back pain also affected her ability to sit.

(R. at 564.) She could sit for only one hour without interruption, and for a total of two hours

each day. (R. at 564.) Plaintiff could never climb, balance, stoop, crouch, kneel or crawl. (R. at

564.) Dr. Chen-Fernandez opined that pushing and pulling triggered Plaintiff's symptoms, but

that reaching, handling and feeling would not affect Plaintiff. (R. at 565.) In support of his

conclusions, Dr. Chen-Fernandez stated that Plaintiff experienced lower back pain and right leg

pain and weakness when trying to push and pull a fifty pound cabinet. (R. at 565.)

On November 20, 2012, Plaintiff returned to Dr. Chen-Fernandez with complaints of pain

in both knees and legs. (R. at 632.) Dr. Chen-Fernandez noted that Plaintiff's back was

unremarkable, and that she had bilateral knee crepitus and painful range of motion in her legs.

(R. at 632.) Dr. Chen-Fernandez diagnosed Plaintiff with knee derangement NOS. (R. at 632.)

He instructed her to continue taking Celebrex, begin taking Flexeril and obtain an x-ray of her

12

left knee. (R. at 632.)  On December 7, 2012, Plaintiff returned for a review of her x-rays.  (R. at 630.)  Dr. Chen-Fernandez examined Plaintiff and once again noted that her back was unremarkable and that she had crepitus in both knees.  (R. at 630.)  He assessed derangement of the knees and injected both knees with Lidocaine.  (R. at 630-31.)

On December 31, 2012, Plaintiff saw Dr. Chen-Fernandez, complaining of right leg pain resulting from cramping and a fall.  (R. at 628.)  Dr. Chen-Fernandez's examination revealed that Plaintiff's back remained unremarkable, and he prescribed Valium for her muscle contracture. (R. at 628-29.)  On January 29, 2013, Dr. Chen-Fernandez observed that Plaintiff's symptoms were improving.  (R. at 626.)  Plaintiff acknowledged this improvement, but stated that she sometimes felt off balance.  (R. at 626.)  Dr. Chen-Fernandez examined Plaintiff and noted that her back remained unremarkable, and that she had a normal range of motion in her extremities, normal sensations and no edema.  (R. at 627.)

On February 22, 2013, Plaintiff saw Dr. Chen-Fernandez to update the paperwork necessary for her to obtain a handicap placard from the Virginia Department of Motor Vehicles ("DMV") and for a refill of her Amitriptyline prescription.  (R. at 624.)  Dr. Chen-Fernandez noted that Plaintiff had normal range of motion in her extremities with no cyanosis, clubbing or edema, and paraspinal muscle tenderness in her lumbar spine.  (R. at 625.)  At Plaintiff's request, Dr. Chen-Fernandez completed the DMV form so that Plaintiff could obtain a disabled parking placard.  (R. at 590-91.)  On the form, he indicated that Plaintiff was permanently disabled and that she could not walk more than two hundred feet without stopping to rest, could not walk without using a cane, and was severely limited in her ability to walk due to an arthritic, neurological or orthopedic condition.  (R. at 591.)  That same day, Dr. Chen-Fernandez also signed off on Plaintiff's form for Temporary Total Disability Deferment Request, and indicated

13

that Plaintiff was permanently disabled due to degenerative disc disease and sciatic neuralgia. (R. at 592.)

On March 18, 2013, Plaintiff returned to Dr. Chen-Fernandez to have him complete a one-page certification documenting her disability for the purpose of obtaining a discharge of her federal student loans. (R. at 593, 622.) Dr. Chen-Fernandez physically examined Plaintiff and observed paraspinal muscle tenderness in her lumbar spine and normal range of motion in her extremities with no cyanosis, clubbing or edema. (R. at 623.) Dr. Chen-Fernandez assessed Plaintiff as having sciatic neuralgia. (R. at 623.) He completed Plaintiff's disability paperwork, opining that Plaintiff's sciatic neuralgia, sacral nerve root compression and chronic back pain prevented her from engaging in substantial gainful activity ("SGA"). (R. at 593.) Dr. Chen-Fernandez further opined that Plaintiff could not stand, sit, walk or lift for more than fifteen minutes at a time, that she completed daily activities at a very slow pace, that she was unable to work due to her symptoms, and that side effects of her medication affected her social behavior. (R. at 593.)

On May 7, 2013, Plaintiff visited Dr. Chen-Fernandez for a physical check-up and to obtain a referral for physical therapy. (R. at 619.) Plaintiff informed Dr. Chen-Fernandez that she was losing her hair and that she was experiencing chronic pain in multiple joints. (R. at 619.) On examination, Plaintiff exhibited paraspinal muscle tenderness in her lumber spine and normal range of motion in her extremities with no edema. (R. at 619-20.) Dr. Chen-Fernandez ordered blood work to check for rheumatoid arthritis and diagnosed Plaintiff with hypertension, polyarthralgia, alopecia and back pain. (R. at 619-20.) He prescribed Lidoderm for Plaintiff's back pain and referred her for physical therapy. (R. at 620-21.)

On July 11, 2013, Plaintiff returned to Dr. Chen-Fernandez, complaining of knee pain after physical therapy. (R. at 617.) Dr. Chen-Fernandez noted that Plaintiff's back was unremarkable on examination, and he injected Lidocaine to relieve her knee pain. (R. at 617-18.) He assessed Plaintiff as having knee derangement NOS, hypertension, anxiety and weight gain. (R. at 618.)

### 4. Internal Medicine Associations of Chesterfield

On May 24, 2013, Plaintiff saw Dr. Joyce E. Beltran-Keeling, M.D. at the Internal Medicine Associates of Chesterfield, complaining of chronic back and bilateral leg pain since 2010. (R. at 664-65.) Plaintiff wanted to establish care as a new patient and to discuss pain medication options. (R. at 665.) Dr. Beltran-Keeling noted that Plaintiff appeared to be on the VCU care card and that she saw Dr. Chen-Fernandez for her pain. (R. at 665.) Dr. Beltran-Keeling's physical examination of Plaintiff yielded normal results, including no pedal edema, clubbing, cyanosis or movement disorder, and normal range of motion in her cervical spine without pain. (R. at 666.) Dr. Beltran-Keeling prescribed Celexa for Plaintiff's depression and instructed her to follow up with Dr. Chen-Fernandez for her leg pain. (R. at 669-70.)

On June 14, 2013, Plaintiff returned to Dr. Beltran-Keeling, complaining of leg and neck pain. (R. at 682.) Plaintiff requested a refill of her Amitriptyline and reported that she had gone to the grocery store and to get tires for her car since her last appointment. (R. at 682.) She stated that she got tired and needed to lie down in between activities, and that she had been doing physical therapy but felt that it made her symptoms worse. (R. at 682.) Plaintiff reported that walking helped her symptoms. (R. at 682.) Dr. Beltran-Keeling noted that Plaintiff appeared well, alert, oriented, fatigued and in mild distress, but her physical examination yielded normal results. (R. at 685.) Plaintiff stated that she stopped taking Celexa after three days, because it

15

made her feel forgetful and strange, and agreed that she had become passive regarding fighting her sedentary lifestyle and depression. (R. at 685.) Dr. Beltran-Keeling instructed Plaintiff to start walking for five minutes per day and instructed her to continue seeing Dr. Chen-Fernandez for her complaints of bilateral leg pain of unclear etiology. (R. at 685.)

    D. Function Report

    As part of her application for disability benefits, Plaintiff completed a function report in February 2012. (R. at 297-303.) Plaintiff indicated that often she could not sleep due to pain, and she took pain medication to fall asleep. (R. at 298.) Plaintiff needed assistance to bathe, dress and use the toilet. (R. at 298.) She could cook meals that took roughly twenty minutes to prepare. (R. 299.) She did not do yard work, but could do laundry, make her bed and perform other household cleaning. (R. at 299.) Plaintiff left the house three to four times each week and drove a car to buy groceries. (R. at 300.) She could pay bills, handle a savings account and use a checkbook. (R. at 300.) Her hobbies included reading daily, and she talked on the phone and messaged on the computer four to five days per week. (R. at 301.) She got along well with her family, friends, neighbors and others. (R. at 302.) Plaintiff also got along with authority figures. (R. at 303.)

    Plaintiff indicated that she could lift approximately ten to twelve pounds. (R. at 302.) She could walk for up to fifteen to twenty minutes before stopping, and could not sit or stand for more than fifteen to twenty minutes at a time. (R. at 302.) Plaintiff indicated that she did not use a wheelchair, walker, cane or any assistive device for walking, and that she used a CPAP machine for sleep apnea. (R. at 303.)

E. Plaintiff's Testimony

On September 10, 2013, Plaintiff, represented by counsel, testified at a hearing before the ALJ. (R. at 37-78.) She testified that she collected unemployment benefits after being fired from her job as a medical assistant until her employer appealed. (R. at 43-44.) Plaintiff appeared in court with a cane prescribed by Dr. Chen-Fernandez, which she began using in 2012. (R. at 45.)

Plaintiff testified that her sciatica and the pain that it caused in her back and legs prevented her from working full-time. (R. at 46.) She stated that she had never had surgery on her back or legs. (R. at 47.) Plaintiff rated her pain on a typical day as an eight out of ten, with ten being the most painful. (R. at 47-48.) Plaintiff took Gabapentin, Tramadol and Celebrex for pain and Amitriptyline for pain and depression. (R. at 48.) She stated that these medications reduced her pain level to a rating of five on the ten-point scale. (R. at 48-49.)

Plaintiff testified that she could sit for thirty to forty-five minutes before having to stand and could stand for that same duration before having to sit. (R. at 49.) She could walk a block without pain and lift less than five pounds without pain. (R. at 49.) She could use eating utensils, lift a light glass of water and text message on her cell phone. (R. at 49-50.) Plaintiff also testified that she had been diagnosed with anxiety, that she was prescribed Buspar and that she saw a psychologist to help her cope with her depression and anxiety. (R. at 51.)

Plaintiff testified that she previously had a drug problem with crack cocaine, but stated that she had not used any drugs for sixteen years. (R. at 52-53.) Plaintiff did not have any serious problems getting along with other people and had around thirty friends that visited her at her home. (R. at 53-54.) She could follow both verbal and written directions. (R. at 54.)

Plaintiff testified that she usually could get up and dress herself without assistance. (R. at 55.) Sometimes, she needed assistance from her husband to bathe or shower. (R. at 55-56.) She also was not able to use the vacuum cleaner, rake leaves, mow the yard, do laundry or grocery shop. (R. at 56-57.) She could take out the trash if it was lightweight, cook quick meals such as spaghetti and wash dishes. (R. at 56-57.) Plaintiff held a driver's license and could drive and ride in a motor vehicle. (R. at 58.)

F. Vocational Expert Testimony

A VE also testified before the ALJ at the hearing held on September 10, 2013. (R. at 75-84.) The VE testified that Plaintiff's past work as a home health aide, as described at the hearing, was medium exertion and her past work as a security guard was light exertion. (R. at 77.) Plaintiff's past work as a medical assistant qualified as skilled work and required light exertion. (R. at 77.) The VE testified that Plaintiff's skills from her previous employment as a medical assistant transferred to sedentary work. (R. at 77.)

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience. (R. at 78.) The ALJ asked the VE to assume that this hypothetical individual had the physical capacity to lift and carry less than ten pounds and could occasionally lift ten pounds; could sit for six hours in an eight-hour workday; could stand or walk up to two hours in an eight-hour workday; needed a cane to ambulate; needed to elevate her feet at normal breaks three times per day; could only occasionally push or pull with her hands at the sedentary level; could only occasionally operate foot controls; could occasionally climb stairs or ramps; could never climb ladders, ropes or scaffolds; and, could never be around unprotected heights. (R. at 80.) In addition, the ALJ restricted the hypothetical individual to jobs that required understanding, remembering and carrying out short, simple instructions. (R. at 81.)

18

The VE testified that such an individual could not perform any of Plaintiff's past work. (R. at 81.) However, the VE indicated that an individual with those restrictions could perform jobs that existed in the national economy. (R. at 81). These jobs included the unskilled jobs of addresser, with 60,000 positions in the national economy; document preparer, with 410,000 positions in the national economy; and order clerk, with 211,000 positions in the national economy. (R. at 81.) The VE testified that these jobs accommodated an individual who needed to stand for two to three minutes after sitting for one hour. (R. at 81.)

## II.     PROCEDURAL HISTORY

On December 15, 2011, Plaintiff filed an application for DIB and, on December 31, 2011, Plaintiff also filed an application for SSI, claiming disability from degenerative disc disease, obstructive sleep apnea, an anxiety disorder, an affective disorder and obesity, with an alleged onset date of September 20, 2011. (R. at 226-41.) Plaintiff's claims were denied both initially and upon reconsideration. (R. at 134-46, 148-61.) Plaintiff filed a written request for a hearing and, on September 10, 2013, Plaintiff, represented by counsel, and a VE testified before the ALJ. (R. at 37-78.) On October 2, 2013, the ALJ issued a written decision denying Plaintiff's request for benefits, concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform jobs existing in the economy. (R. at 14-28.)  On December 4, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-3.)

## III.     QUESTION PRESENTED

Did the ALJ err in his assessment of Dr. Chen-Fernandez's opinion?

## IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla but less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted).  Although the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted SGA. 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Social Security Administration in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. §§ 404.1572(a), 416.972(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572(b), 416.972(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. §§ 404.1572(c), 416.972(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment entitling one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R.

21

§§ 404.1520(c), 416.920(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) that lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to her past relevant work[2] based on an assessment of

the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits

will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the

analysis, such that she must prove that her limitations preclude her from performing her past

relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant can perform other work that is available in significant

numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207

F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry

---

[2]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[3]    RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record. *Id.*

her burden in the final step with the testimony of a VE. 20 C.F.R. §§ 404.1560, 416.960. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## V.    ANALYSIS

### A. The ALJ's Decision

On September 13, 2013, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 37-84.) On October 2, 2011, the ALJ rendered his decision in a written opinion, determining that Plaintiff was not disabled under the Act. (R. at 14-28.)

The ALJ followed the five-step sequential evaluation process established by the Act in analyzing whether Plaintiff was disabled. (R. 19-28.) First, the ALJ found that Plaintiff had not engaged in SGA since her alleged onset date. (R. at 19.) At step two, the ALJ determined that Plaintiff suffered severe impairments of degenerative disc disease, obstructive sleep apnea, an anxiety disorder, an affective disorder and obesity. (R. at 19-20.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-23.) The ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with significant limitations. (R. at

22-26.) At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (R. at 26.) Finally, at step five of the analysis, the ALJ concluded that based upon Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in the economy. (R. at 27.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 27.)

    B.  Substantial evidence supports the ALJ's decision to afford Dr. Chen-Fernandez's opinion very limited weight.

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred in affording Dr. Chen-Fernandez's opinion very limited weight. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 8-9.) Defendant responds that substantial evidence supports the ALJ's determination to afford little weight to the opinion of Dr. Chen-Fernandez. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 17) at 15-21.)

During the sequential evaluation, the ALJ must analyze the claimant's available medical records and any medical evidence resulting from consultative examinations or medical expert evaluations to determine whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent with each other or other evidence in the record, then the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.  However, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinions:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

In this case, the ALJ was forced to reconcile divergent medical opinions and assign them weight.  The ALJ afforded Dr. Chen-Fernandez's opinion very limited weight, because it was inconsistent with the evidence as a whole and with his own treatment notes.  (R. at 26.) Substantial evidence supports the ALJ's decision.

Dr. Chen-Fernandez treated Plaintiff between June 27, 2012 and July 2013.  (R. at 616-647.)  On October 26, 2012, Dr. Chen-Fernandez completed an RFC assessment for Plaintiff.

(R. at 563-66.)  He opined that Plaintiff's sciatic neuralgia, sacral nerve root compression and

back pain limited Plaintiff to lifting five pounds frequently and less than ten pounds

occasionally, standing for up to two hours in an eight-hour workday and sitting for up to two

hours in an eight-hour work day.  (R. at 563-64.)  Dr. Chen-Fernandez also opined that Plaintiff

should never climb, balance, stoop, crouch, kneel or crawl, and stated that both pushing and

pulling triggered Plaintiff's symptoms.  (R. at 564-65.)

Substantial evidence supports the ALJ's decision on the basis that Dr. Chen-Fernandez's

medical records are inconsistent with his opinion regarding the nature and extent of Plaintiff's

disability.  On June 27, 2012, a physical examination showed that Plaintiff had normal range of

motion with no clubbing, cyanosis or edema.  (R. at 647.)  On July 25, 2012, Dr. Chen-

Fernandez noted that Plaintiff's elbow pain had improved with medication and that her back

remained unremarkable.  (R. at 644.)  On August 8, 2012, Dr. Chen-Fernandez reported filling

out paperwork for Plaintiff to obtain a handicap parking permit.  (R. at 642.)  However, when

Plaintiff returned a mere nine days later, Dr. Chen-Fernandez noted that her back was

unremarkable and she exhibited normal range of motion without clubbing, cyanosis or edema.

(R. at 640.)  One month later, on September 18, 2012, Dr. Chen-Fernandez observed that

Plaintiff's back remained unremarkable and without pain.  (R. at 637.)

On October 26, 2012, Dr. Chen-Fernandez indicated that Plaintiff demonstrated normal

range of motion with no clubbing, cyanosis or edema in her extremities.  (R. at 634-35.)  On

November 20, 2012, less than one month after completing Plaintiff's RFC assessment, Dr. Chen-

Fernandez noted once again that Plaintiff's back was unremarkable.  (R. at 632.)  When Plaintiff

returned two weeks later to review her x-rays, Dr. Chen-Fernandez indicated that Plaintiff's back

remained unremarkable.  (R. at 628.)  On January 29, 2013, Dr. Chen-Fernandez examined

Plaintiff and opined that her symptoms were improving. (R. at 626-27.) On both February 22, 2013 and March 18, 2013, Dr. Chen-Fernandez observed that Plaintiff had normal or full range of motion in her extremities with no clubbing, cyanosis or edema, but nevertheless opined that she was permanently disabled on DMV forms and federal loan repayment forms that he completed at these appointments. (R. at 591-93, 622-25.) The stated severity of Plaintiff's condition and associated limitations are at odds with Dr. Chen-Fernandez's own treatment notes made the very same day as he completed each of those forms. On July 11, 2013, Dr. Chen-Fernandez again indicated that Plaintiff's back was unremarkable. (R. at 617.)

Other medical records also support the ALJ's determination. On March 30, 2011, Dr. Joseph noted that Plaintiff had no major medical concerns and merely wanted to confirm that she was healthy. (R. at 540.) Dr. Joseph performed a physical evaluation of Plaintiff that returned mostly normal results. (R. at 540.) On June 20, 2011, Dr. Bashir conducted a physical examination that revealed no clubbing, cyanosis or edema in Plaintiff's extremities. (R. at 340.) Plaintiff's overnight polysomnography on July 12, 2011, showed that Plaintiff had normal EEG data, normal sleep latency in both light and deep sleep stages, and no significant oxygen desaturations at final pressure. (R. at 358.) On February 3, 2012, a repeat polysomnography in February revealed no evidence of significant obstructive sleep apnea. (R. at 573-74.)

On July 30, 2011, Dr. Mendez's physical examination revealed that Plaintiff had full range of motion. (R. at 375.) X-rays taken on August 3, 2011, showed a normal right hip with no signs of abnormalities, and a spinal x-ray showed normal spine alignment and well-preserved vertebral body heights. (R. at 381.) On September 4, 2011, Dr. Choudry noted that Plaintiff had full range of motion with no signs of edema. (R. at 386.)

On October 4, 2011, Dr. Foster examined Plaintiff and reported that she was alert and

27

oriented and had no focal, sensory or motor deficits. (R. at 495.) Dr. Foster further reported that

Plaintiff had normal range of motion, muscle strength of 5/5 in all muscle groups, and no

clubbing, cyanosis or edema in her extremities. (R. at 495.) On November 1, 2011, Dr. Foster

once again noted that Plaintiff had normal range of motion with maximum strength of 5/5 in all

muscle groups, no clubbing, cyanosis or edema, and no focal, sensory or motor deficits. (R. at

493.) On November 26, 2011, Dr. Dimaio examined Plaintiff and observed normal range of

motion with no tenderness or edema. (R. at 409.) Dr. Dimaio noted that Plaintiff's straight leg

test was negative bilaterally, and that she was alert with normal mood and affect. (R. at 409.)

On May 24, 2013, Dr. Beltran-Keeling performed a physical examination of Plaintiff that

yielded normal results. (R. at 666.) Dr. Beltran-Keeling observed no pedal edema, clubbing,

cyanosis or movement disorder, and she noted that Plaintiff had normal range of motion in her

cervical spine without pain. (R. at 666.) On June 14, 2013, Plaintiff reported to Dr. Beltran-

Keeling that she had gone to the grocery store and to get tires for her car since her last

appointment, and stated that walking helped her symptoms. (R. at 682.)

Plaintiff's own statements further support the ALJ's decision. Plaintiff stated that she

could do laundry, make her bed and perform other household cleaning. (R. at 297-299.)

Plaintiff spent around twenty minutes preparing and cooking meals. (R. at 299.) Plaintiff could

drive herself, and went out on her own three to four times per week. (R. at 300.) She went

grocery shopping in stores weekly. (R. at 300.) She could lift between ten and twelve pounds.

(R. at 302.) Plaintiff could pay bills, handle a savings account and use a checkbook. (R. at 300.)

She read daily, used the computer and talked on the phone several times per week. (R. at 300-

01.) She had no trouble getting along with family, friends, neighbors or others, and could get

along with authority figures. (R. at 302-03.) Plaintiff could follow spoken and written

28

instructions "pretty good." (R. at 302.)

Plaintiff's hearing testimony also supports the ALJ's decision. Plaintiff testified that she took pain medication that reduced her pain from an eight to a five on a ten-point scale. (R. at 49.) She stated that she could dress herself without assistance most of the time. (R. at 55.) She was able to take out lightweight trash, cook meals and wash dishes. (R. at 56-57.) Plaintiff continued to drive and could ride in a car as a passenger. (R. at 58.) She rarely had trouble using her hands. (R. at 50.) Plaintiff did not have any serious social problems; she got along with other people and had approximately thirty friends who visited at her home. (R. 53-55.) She did not have trouble following written or spoken directions. (R. at 54.) Therefore, substantial evidence supports the ALJ's decision to afford very little weight to Dr. Chen-Fernandez's opinion.

## VI.   CONCLUSION

Based upon the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Plaintiff's Motion to Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 17) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____     /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 26, 2015